

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DAVID KENNETH BERMUDEZ, | § | No. 08-23-00349-CR |
| Appellant, | § | Appeal from the |
| v. | § | 120th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20230D00688) |

## MEMORANDUM OPINION

Appellant David Bermudez was convicted by a jury on two counts of Medicaid fraud, and one count of theft of an amount between $750 and $2,500. The charges all relate to Appellant's submission of his time for services rendered to a Medicaid recipient *after* the recipient had died. Appellant was sentenced to ten years in prison, probated for eight years, on the Medicaid offenses; and one year in prison, probated for two years, on the theft count, with all counts running concurrently. Before this Court, Appellant contends the trial court erred in: (1) admitting two charts compiling already-admitted information because the charts contained hearsay and relied on unqualified, unreliable expert testimony; and (2) excluding a voicemail message that was authenticated and relevant to Appellant's defense. Appellant also argues the evidence presented at

trial was legally insufficient to support the convictions. Finding no reversible error, we affirm the trial court's judgment.

## I. BACKGROUND

### A. Appellant approved as Medicaid provider for his great-grandmother.

Appellant's great-grandmother is Anita Granados (Granados). In 2013, at Granados' request, and with the approval of AmeriGroup (Granados' third-party Medicaid administrator), Appellant became a "provider" for non-medical Medicaid-approved services to Granados. At the time, Appellant was among several providers employed by Outreach Health Community Care Services (Outreach).[1] Based on verification of the services provided to a patient by a particular provider, Outreach submitted claims for Medicaid reimbursement to AmeriGroup. AmeriGroup would then reimburse Outreach, which, in turn, compensated its providers by payroll draft.

### B. Appellant training in and verification of Outreach policies and procedures.

On May 28, 2013, Appellant underwent a 90-minute one-on-one orientation and training with Outreach recruiter Alejandrina Valenzuela. In that process, Appellant received the Community Care Caregiver job description, which included mandates to follow all company rules and to work ethically and responsibly. Other than a high school diploma, the position required no specific educational background, licensing or certifications. Appellant exceeded that requirement by also having a Bachelor of Arts degree in Economics and Business.

During his training, Appellant was informed of the State-approved non-medical services he was allowed to provide for Granados. These services included bathing, dressing, grooming,

---

[1] Recruiter Alejandrina Valenzuela testified Outreach employed between 600 and 700 providers in 2013.

feeding, toileting, housecleaning, laundry, meal preparation, transportation, routine hair and skin care, exercise, shopping, and assisting with self-administered medication. Appellant was also notified of those tasks which he, as a provider, was *not* allowed to undertake while caring for Granados. Further, providers were prohibited from becoming involved in a patient's personal finances, and working hours beyond those authorized. As a provider, Appellant was not to be in the patient's home (providing permitted services) if the patient was not present. By affixing his signature to applicable forms in the Outreach orientation packet, Appellant verified his receipt and understanding of the permitted and non-permitted services.

While training, Appellant was advised of certain types of information that he needed to immediately report to his Outreach supervisor. Generally, an immediate report was required if a provider observed any significant change in the patient's needs or health status. More specifically, Appellant was to immediately report to his supervisor if Granados was unable to care for herself when left alone, if his patient was not at home to receive services, or if there was any change in Appellant's ability to complete his approved tasks. His recruiter testified, although not specifically stated in the training documents, the death of a patient would be the type of significant health change for which an immediate report to a supervisor was mandated. By his signature, Appellant acknowledged his receipt and understanding of these duties.

Appellant's training also included instruction on the use of the Electronic Visit Verification (EVV) system. AmeriGroup uses that particular timekeeping software and an accompanying device to document its providers' services and make its reimbursement claims to Medicaid.[2] Upon arrival, Appellant would access a code (or token) from an EVV device installed in the patient's

---

[2] According to Texas Medicare Fraud Unit criminal investigative auditor Myrna Ramos, the EVV system is required for provider timekeeping documentation by the Centers for Medicaid and Medicare (CMS).

home. Appellant would then call a designated phone number and provide Granados' patient identification number, Appellant's provider identification number, and the one-time EVV code exclusive to Appellant at the time it was obtained from the device. Upon completion of his health-care services, Appellant would secure another code from the device, calling in the identification numbers and code in a similar manner. In this section of his Outreach training, Appellant was specifically instructed to keep his unique identification number private to avoid billing discrepancies with other Outreach caregivers.

Based on the exclusive codes transmitted by the EVV device, AmeriGroup obtained time-stamp information documenting a specific provider's time with a particular patient on a particular day. The EVV information was electronically transmitted regularly to Outreach's billing department both for its submission of Medicaid-reimbursement claims to AmeriGroup and for its calculation of provider paychecks.

At the conclusion of his May 2013 training session, Appellant executed documents confirming his training, along with his receipt and understanding of all Outreach policies and procedures. The next day, Appellant and his then-supervisor Ruby Martinez met at Granados' home to review the same policies and procedures with Granados, Appellant's patient. Upon completion of that review, Appellant, in the presence of his supervisor, again signed all the Outreach training documents and re-affirmed his understanding of the policies and procedures.

Following reviews in November 2013 and May 2014 respectively, Appellant once again acknowledged his receipt and understanding of all Outreach policies and procedures. Appellant next confirmed his receipt and understanding of all Outreach policies and procedures on October 2, 2017, ten days before Granados passed away. During the October 2017 review, Appellant was

reminded of the Outreach requirement to immediately report any significant changes in Granados' health to his Outreach supervisor.

### C. Appellant's continued use of EVV post-Granados' death.

Granados passed away on October 12, 2017; however, Appellant did not notify Outreach of her death. Instead, he continued to access the EVV system to electronically clock in and clock out, documenting services from October 12, 2017 through December 4, 2017. Based on Appellant's EVV entries in that timeframe, Outreach processed 52 Medicaid reimbursement claims to AmeriGroup. Based on those claims, AmeriGroup reimbursed Outreach in the amount of $3,463.27. Through its payroll, Outreach then compensated Appellant $2,366, netting Appellant $1,963.21 for services billed on the day of Granados' death through December 4, 2017.

### D. Outreach termination of appellant-February 2018.

Outreach received notice of Granados' death on February 7, 2018, almost four months after she passed. Sometime before February 9, 2018, Appellant's then-supervisor, Hector Soltero, informed Jaime Lopez, Outreach Director of Patient Care, that Appellant had continued to use the EVV system to bill for services allegedly rendered to Granados after her death. Before speaking with Lopez, Soltero had made several unsuccessful attempts to discuss the improper billing with Appellant. When Soltero finally reached Appellant by phone on February 9, 2018, Soltero transferred the call to Lopez' office so both men could listen to and participate in the conversation.

During the call, Lopez informed Appellant of the number of hours and total amount of money that Outreach had billed to Amerigroup, based on Appellant's EVV entries after Granados' death. Lopez asked Appellant why he had continued to bill for services after his great-grandmother's death. In response, Appellant said something like, "there was still a lot of work to do" or Appellant "still had to take care of a lot of things." Understanding Appellant's reply to mean

5

Appellant was admitting his continued access of the EVV system despite Granados' death, Lopez informed Appellant his employment with Outreach was terminated. At no time during or after the February 2018 phone call did Appellant offer to re-pay the over-billed funds. Outreach ultimately reimbursed AmeriGroup for the amounts that Appellant had billed after Granados' death.

### E. Indictment, trial, and jury verdict.

Appellant was charged with two counts of Medicaid Fraud under Texas Penal Code § 35A.02(a), and one count of theft in an amount greater than or equal to $750 but less than $2,500, under Texas Penal Code Ann. § 31.03(a)(e)(3).[3] The charges stem from Appellant's submission of 52 Medicaid claims from October 12, 2017 through and including December 4, 2017.

During trial, the State called Myrna Ramos, a criminal investigative auditor for the Texas Attorney General's Medicare Fraud Unit. At the time, Ramos held an undergraduate degree in accounting and a master's degree in business administration. She had been with the Medicare Fraud Unit for almost 16 years. Ramos' duties with the Unit included the investigation and calculation of the dollar amounts fraudulently over-charged to Medicaid. As part of her investigation, Ramos subpoenaed records from AmeriGroup and from Chase, Appellant's personal bank. She also secured Appellant's entire personnel file, including training documents, payroll and EVV records, from Outreach.[4] After explaining the general procedure through which a provider's EVV billing entries supply the basis for Outreach to submit claims for Medicaid reimbursement

---

[3] The Indictment originally included an additional count for securing the execution of documents by deception; however, the trial court dismissed that count before charging the jury.

[4] The subpoenaed business records, which were voluminous, were admitted as State's Exhibit 1 without objection.

6

from AmeriGroup, Ramos sponsored two charts she created by compiling information from business records previously admitted as State's Exhibit 1.[5]

The first chart, entitled, "Schedule of Identified Overpayments," itemized all of the time billed by Appellant and the corresponding amounts paid by Outreach to Appellant from October 12 to December 4, 2017. Ramos testified that the amounts submitted by Outreach (based on Appellant's EVV entries) were considered "overpayments" because the billing related to "services *not* rendered." As noted in the chart, the Medicaid overpayment to Outreach made as a result of Appellant's billing entries after Granados' death totalled $3,463.27.

In the second chart, referred to as a "time pay analysis," Ramos compiled the "time in–time out" information from Appellant's EVVs in the subject timeline, the corresponding rate of pay for each entry, and the amounts paid to Appellant through Outreach's payroll, totalling $2,366 in gross pay, and a $1,963.21 net payment to Appellant. Ramos confirmed, as noted in the chart, that each Outreach paycheck (compensating Appellant for service entries made post-Granados' death), was deposited directly into Appellant's personal bank account.

After the State rested, Appellant called one witness—his former Outreach supervisor Hector Soltero. Appellant sought to have Soltero authenticate a voicemail message. Soltero recognized his own voice and acknowledged his reference to the date "November 30" in the message. But Soltero could not recall leaving the message, the date the message was left, or for whom he left it. He could only confirm that he intended the message for whomever he had called.

---

[5] As discussed below, and subject of this appeal, Appellant's counsel objected to the admission of both charts, claiming they were based on hearsay, were cumulative, and called for expert analysis. Overruling all objections, the trial court admitted the charts.

When Appellant's counsel tendered the voicemail message, the trial court sustained the State's hearsay and improper predicate objections.

After deliberation, the jury found Appellant guilty on each of the three counts charged. The court assessed punishment at ten years in prison, probated for eight years, on the Medicaid offenses; and one year in prison, probated for two years, on the theft count, with all counts running concurrently.

Appellant presents three issues on appeal. First, Appellant argues the trial court erred by admitting the charts prepared by Ramos. Appellant's second issue contends the trial court erred when it excluded Soltero's voicemail message because it was properly authenticated and relevant to his defense. Finally, Appellant argues the trial court failed to safeguard his due process rights because the evidence presented to the jury was legally insufficient to support his conviction.[6]

## II. DISCUSSION

### A. No error in admission of Ramos charts.

**(1) Standard of review and controlling law.**

A trial court's admission of evidence, including the admission of a witness' testimony over a defendant's expert-qualification objection, is reviewed for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). A trial court abuses its discretion in admitting evidence if the ruling falls outside the zone of reasonable disagreement or the trial

---

[6] On appeal, Appellant also claims the evidence was *factually* insufficient to support his conviction. That claim presents nothing for review. Finding no meaningful distinction for the retention of both the legal and factual insufficiency standards of review, the Texas Court of Criminal Appeals has collapsed the appellate analysis to legal sufficiency only pursuant to the *Jackson v. Virginia* standard. *See Brooks v. State*, 323 S.W.3d 893, 905–06, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *cf.*, *Cary v. State*, 507 S.W.3d 761, 765–766 (Tex. Crim. App. 2016) (stating, "[W]hen determining whether the evidence is sufficient to support a criminal conviction, the only standard an appellate court should apply is the *Jackson v. Virginia* test for legal sufficiency.").

court acts without reference to guiding rules or principles. *Id.* ; *Holcombe v. State*, No. 08-17-00008-CR, 2018 WL 6629700, at *7 (Tex. App.—El Paso Dec. 19, 2018, no pet.) (mem. op., not designated for publication).

Expert testimony is governed by Rule 702 of the Texas Rules of Evidence.[7] *See* Tex. R. Evid. 702. Under that rule, the trial court acts as a gatekeeper, determining whether a proffered expert is qualified, whether the expert's testimony is reliable, and whether the testimony will assist the factfinder in making its determinations. *See Rhomer*, 569 S.W.3d at 669 (noting the Rule 702 requirements "are commonly referred to as (1) qualification, (2) reliability, and (3) relevance"); *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992) (en banc) (confirming a trial court's "first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results"). Before admitting expert testimony, the trial court must determine if the testimony is a proper "fit" with the facts of the case, as "fit" is a component of qualification. *See Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006).

Whether expert testimony will assist the trier of fact is a threshold issue for the trial court's determination. *Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000). Stated another way, the testimony must be "sufficiently tied to the facts" to meet the simple requirement that it be "helpful" to the jury. *Id.* (citing *Jordan v. State*, 929 S.W.2d 550, 555 (Tex. Crim. App. 1996)). Because the trial court is given wide discretion in considering whether a proffered expert witness is sufficiently qualified under Rule 702, an appellate court will rarely disturb the trial

---

[7] Tex. R. Evid. 702 ("A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue.").

court's determination. *Vela*, 209 S.W.3d at 136 (citing *Rodgers v. State*, 205 S.W.3d 525, 528 n.9 (Tex. Crim. App. 2006)).

### (2) Analysis.

#### (a) Ramos' testimony and charts assisted the factfinder under 702.

Appellant contends Ramos' charts were erroneously admitted because they contained (or were based on) hearsay and unqualified, unreliable expert opinions.

Taking the hearsay argument first, Ramos specifically testified that the charts were compiled using information contained in State's Exhibit 1, which had previously been admitted without objection. Thus, any hearsay objections should have been made when the State tendered Exhibit 1. Because the record reflects defense counsel failed to state that objection when Exhibit 1 was proffered, Appellant's hearsay objections to the charts were waived and, consequently, are not preserved for appellate review.[8] Tex. R. App. P. 33.1(a)(1)(A).

Similarly, Appellant's contention the charts contained "unreliable" expert opinion is not preserved for our review because Appellant did not lodge that specific objection below. *See Hallmark v. State*, 541 S.W.3d 167, 171 (Tex. Crim. App. 2017) (confirming that, if the complaint raised on appeal fails to comport with the objection made at trial, nothing is preserved for appellate review). While a party is not required to use "magic words" to state a valid objection, the objection must be sufficiently clear both to allow the trial court an opportunity to properly address it and to provide opposing counsel a chance to correct the alleged error. *See Ford v. State*, 305 S.W.3d 530,

---

[8] The trial court correctly noted the waiver when Appellant's counsel raised the hearsay objection to the second chart:

> [Defense] Same objection, Your Honor, cumulative, the document is based on hearsay, as well as calls for an expert analysis.

> [Court] Bring it up, let me see it. It's not hearsay, you have it admitted from these business records.

533 (Tex. Crim. App. 2009); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (confirming that, although "hyper-technical or formalistic use of words or phrases" are not required, an objection must be sufficiently clear and made at a time when the trial court is "in the proper position to do something about it").

When State's Exhibits 12 and 13 were offered, defense counsel objected that the charts called for an expert opinion (or expert "analysis"). At no time did defense counsel argue the charts contained or were based on "unreliable" expert opinions. Even assuming Appellant's counsel's use of the phrase, "calls for expert analysis," somehow relate to *reliability* (or the reliability of her opinions as reduced in the charts), the phrase is too general to alert the trial court that the chart fails one of the several predicates for expert opinion. *See Null*, 690 S.W.3d at 318–19 (agreeing with several Texas appellate courts that a general objection to the reliability of expert evidence does not preserve the error for appellate review).

Appellant alternatively asserts the jury did not need Ramos' "specialized knowledge" to assimilate the information presented in the two charges. We disagree. Rule 702 includes a "helpfulness" standard; thus, even if the jury can evaluate the evidence, the expert may still provide some special knowledge or insight that would be helpful. *See Rodgers*, 205 S.W.3d at 528. Indeed, an expert "may add precision and depth to the ability of the trier of fact to reach conclusions about subjects which lie well within common experience." *Id*. (quoting D. Louisell & C. Mueller, *Federal Evidence* § 382, at 640 (1979)).

Here, based on her experience investigating fraudulent Medicaid overpayment cases, Ramos condensed voluminous data into two charts which demonstrated: (1) Appellant used the EVV system, despite his patient's death, to continue logging time entries allegedly documenting services rendered; and (2) Appellant profited from the entries when he received Outreach

11

paychecks for the hours billed, and when those paychecks were deposited directly into his personal bank account. While the jury could have independently reviewed the information (as the State specifically encouraged it to do in its Closing),[9] Ramos' expertise assisted the jury in locating the most determinative information for their deliberations. On that basis, we agree with the trial court's reasonable finding that Ramos' direct testimony as well as the "analysis" expressed in her charts, assisted the jury.

Ramos' education, along with her experience and skills developed in a 16-year career investigating Medicaid fraud cases qualified her to testify as an expert. The charts fit the evidence and issues in the case. Our review finds the trial court did not abuse its discretion in admitting the Ramos charts. Appellant's first and second points of error are overruled.

**B. No error in exclusion of voicemail where not authenticated.**

Appellant's third issue complains of the trial court's exclusion of a voicemail from Appellant's former supervisor. In the message, which was left on December 4, 2017, the supervisor informs whomever he is calling that Granados' services are cancelled as of November 30 and that there will be no more services rendered by Appellant.[10] From the message, defense counsel intended to argue that Appellant stopped accessing the EVV system on the same day, inferring it

---

[9] During its Closing, the State did not emphasize or rely on the charts for its conclusions and instructed the jury to take the time to review the information provided in State's Exhibit 1.

[10] Pursuant to the State's filed-stamped Spanish-to-English translation, Soltero's voicemail message stated:

> I was calling you to tell you that your service was cancelled as of November the 30th. Therefore, you cannot [unidentified] to Granados tomorrow–tomorrow, Tuesday, try contact[ing] Maria Perez or myself at the office. My name is Hector Soltero as soon as possible to give you information, but tomorrow you cannot have services with David Granados–excuse me, David Bermudez. Okay. I'll contact you tomorrow if possible. Have a good day.

was only then that he learned his actions were improper. The State objected to the voice mail on grounds of improper authentication, hearsay, and relevance. We need only address the authentication objection.

### (1) Standard of review and controlling law.

As with the admission of expert testimony, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). The trial court is given wide latitude in its decision to admit or exclude evidence. *Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992) (en banc). This is because "trial courts . . . are usually in the best position to make the call on whether certain evidence should be admitted or excluded." *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We may not substitute our own decision for that of the trial court. *Gonzalez*, 544 S.W.3d at 370.

Rule 901 of the Texas Rules of Evidence governs the authentication of evidence: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what its proponent claims it is." *See* Tex. R. Evid. 901(a). At trial, the court makes the preliminary determination that "the proponent . . . has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic." *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). The authentication requirement is satisfied by evidence demonstrating the item's distinctive characteristics, such as content and substance, "taken in conjunction with circumstances." *See Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007) (citing Tex. R. Evid. 901(b)(4)). The

trial court need not itself be convinced the item is authentic; it need only determine a reasonable juror could find that the item is authentic. *Id.*

### (2) Analysis

Appellant attempted to authenticate and admit the voicemail message allegedly left on Granados' phone through Appellant's former Outreach superior, Hector Soltero.[11] While on the witness stand, however, Soltero could do little more than identify his voice and his reference to the date "November 30." Soltero did not recall Appellant personally, did not recall leaving the message, did not know when the message was left, did not know for whom he left the message, did not recall being present with Lopez when Appellant was terminated (over the phone), and did not remember the Attorney General's investigation of Outreach regarding Appellant's over-billing for services rendered after Granados' passing.

During separate bench conferences, the court questioned when and where the message was made, and to whom. After sustaining the State's objections on hearsay and improper authentication, the court allowed defense counsel another chance to lay a proper predicate. Despite that attempt, defense counsel excused Soltero, admitting to the trial court that Soltero could not authenticate the message.

We agree with that concession: the voicemail message was not properly authenticated by Soltero and, thus, the trial court did not abuse its discretion in excluding it under Rule 901. With only the identification of Soltero's voice and a reference to "November 30," but no evidence demonstrating the message's distinct characteristics or context, the trial court could not reasonably

---

[11] Outside the jury's presence, defense counsel also played the voicemail message for Outreach Office Manager Debra Rodriguez and for Jaime Lopez, Soltero's Outreach supervisor, allowing both to positively identify the voice in the message as Soltero's.

determine whether a reasonable juror could conclude the item was what its proponent intended to claim it was. *See Druery*, 225 S.W.3d at 502.

Appellant's third point of error is overruled.

## C. The evidence was legally sufficient for any rational trier of fact to convict.

### (1) Standard of review.

The Fourteenth Amendment guarantee of due process requires that every conviction must be supported by legally sufficient evidence. *See Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). In reviewing the legal sufficiency of the evidence to support a criminal conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 318–19; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard applies whether the evidence was direct or circumstantial. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We defer to the factfinder to make inferences and resolve conflicts in the evidence. *Id.*

For a sufficiency review, we examine the events occurring before, during, and after the commission of the offense. *Hooper*, 214 S.W.3d at 13 (citing *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App.1985)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* We do not re-weigh the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We may not resolve any conflict of fact or assign credibility to the witnesses. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992) (en banc).

We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson.*" *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). That said, "[w]e are not to sit as a thirteenth juror re-weighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex. Crim. App. 1988) (en banc). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id.* (citing *Jackson*, 443 U.S. at 318).

The legal sufficiency of evidence is measured against the elements of the offense defined in the hypothetically correct jury charge. *Perez v. State*, No. 08-19-00155-CR, 2021 WL 2525507, at *3 (Tex. App.—El Paso June 21, 2021, no pet.) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct jury charge is one that at least "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

**(2) Analysis.**

**(a) Count I.**

Under Count I, a person commits the offense of Medicaid fraud under the then-effective version of Section 35A.02(a)(1)[12] when the person (1) submits 50 or more claims, (2) by knowingly making or causing to be made (3) a false statement or representation of material fact,

---

[12] *See* Tex. Penal Code Ann. § 35A.02(a)(1), amended by Act of May 26, 2005, 79th Leg., R.S., ch. 806 § 16, sec. 35A.02 2005 Tex. Gen. Laws 2778, 2784.

or by knowingly concealing or failing to disclose information, (4) in order to permit another person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized. *See* Tex. Penal Code Ann. § 35A.02(a)(1), amended by Act of May 26, 2005, 79th Leg., R.S., ch. 806 § 16, sec. 35A.02, 2005 Tex. Gen. Laws 2778, 2784.

On appeal, Appellant challenges whether the State presented any evidence he actually submitted a claim because, under the statute at the time, a "claim" required a signature affixed to it. Appellant asserts that because the EVV entries from October 12, 2017 to December 4, 2017 lack his *written* signature, he cannot be found guilty of the offense charged.

Under the statute, a "claim" was defined as "a written or *electronically submitted request* or demand that is *signed* by a provider or a fiscal agent and that identifies a product or service provided or purported to have been provided to a healthcare recipient as reimbursable under the Medicaid program, without regard to whether the money that is requested or demanded is paid." *See* Tex. Hum. Res. Code Ann. § 36.001(1–a) (A), amended by Act of March 26, 2015, 84th Leg., R.S., ch. 1, § 4.179, sec. 36.001(3), 2015 Tex. Gen. Laws 1, 769 (emphasis added). Section 36.001(11) defines the term "signed" as "to have affixed a signature directly or indirectly by means of handwriting, typewriting, signature stamp, *computer impulse*, or other means recognized by law." *Id.* § 36.001(11) (emphasis added).

The term "computer impulse" is not defined by the statute. We therefore consider the plain and ordinary meaning of the term. *See* Tex. Gov't Code Ann. §311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and usage."). Similarly, "words not specifically defined by the Legislature are to be understood as ordinary usage allows, and jurors may thus freely read [undefined] statutory language to have any meaning which is

17

acceptable in common parlance." *Denton v. State*, 911 S.W.2d 388, 390 (Tex. Crim. App. 1995) (en banc) (citing *Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992), *superceded by statute on other grounds as noted in Phelps v. State*, 5 S.W.3d 788, 797 (Tex. App.—San Antonio 1999, pet. ref'd)).

The Merriam-Webster Dictionary defines "computer" as a "programmable, usually electronic, device that can store, retrieve, and process data." *Computer*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/computer (last visited January 22, 2025). The Cambridge Dictionary defines "impulse" as "a short electrical, radio, or light signal that carries information or instructions between the parts of a system." *Impulse*, Cambridge Dictionary, https://www.dictionary.cambridge.org/us/dictionary/english/impulse (last visited January 22, 2025). While the phrase "computer impulse" is less likely part of our "computer" lexicon, the idea that documents can be electronically signed, or that a signature may be electronically affixed is commonplace.[13]

At trial, the State presented evidence (through the testimony of Outreach supervisors and Ramos) that the EVV codes used by Appellant to document services rendered (for later Medicaid reimbursement) were unique to him. Appellant alone could secure the unique codes by accessing the EVV device installed in Granados' home solely for that purpose. Then, by dialing a particular phone number, and inputting his private identification number, Granados' patient identification number, and the exclusive one-time code, Appellant electronically "clocked in and clocked out."

---

[13] *See Aerotek, Inc. v. Boyd*, 624 S.W.3d 199, 208 n.34 (Tex. 2021) (discussing what constitutes a "signature," and noting "[i]t has long been the law in this State that 'any mark' can qualify as a person's signature, including a simple cross."); *Bustillos v. State*, 213 S.W.2d 837, 841 (Tex. Crim. App. 1948) (quoting *In re Walker's Estate*, 110 Cal. 387, 393 (1895)) ("To sign, in the primary sense of the word, is to make any mark. To sign an instrument or document is to make any mark upon it in token of knowledge, approval, acceptance, or obligation.")

Based on the coded procedure, a rational juror could have concluded that the EVV entries, exclusive to Appellant's time with Granados, effectively represented Appellant's electronic "signature."[14] As verified by his hand-written signature, Appellant had previously acknowledged his understanding of the Outreach policies and procedures mandating timekeeping procedures through the EVV software system. On that basis, a rational juror could also conclude that Appellant recognized, in order to be employed, he needed to document his services which in turn allowed Outreach to submit claims for Medicaid reimbursement. Consequently, Appellant was paid from Medicaid funds conditioned on his participation in electronic "clock in and clock out" procedures requiring unique electronic codes.

Because Appellant accessed the EVV device to obtain the codes, a reasonable juror could conclude Appellant initiated the process through which electronic impulses ultimately documented his daily time and Medicaid-reimbursable services for the Outreach billing department. Thus, while not the usual "pen-and-ink" signature, a rational juror could have found Appellant, a college-educated person, reasonably understood that, each time he used the EVV system, he was "signing" the Medicaid claims (which resulted in Medicaid reimbursement). On that same basis, a rational juror could conclude Appellant statutorily "signed" the Medicaid claims on 52 separate occasions from October 12 through December 4, 2017 as charged in Count 1.

**(b) Count II.**

A person commits the offense of Medicaid fraud, pursuant to (the former version of portions of) § 35A.02(a)(1), (a)(2) and § 35A.02(b)(4)(A) of the Texas Penal Code, when the person (1)

---

[14] Section 36.001(11) of the Texas Human Resources Code recognizes that the term "signed" includes "other [signature] means recognized by law." *See* Tex. Hum. Res. Code Ann. § 36.001(11).

knowingly made or caused to be made (2) a false statement or representation of material fact or knowingly concealed or failed to disclose information (3) in order to permit another person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, and (4) the benefit or payment received was $2,500 or more but less than $30,000. *See* Tex. Penal Code Ann. §§ 35A.02(a)(1), 35A.02 (a)(2), amended by Act of May 26, 2005, 79th Leg., R.S., ch. 806 § 16, sec. 35A.02, 2005 Tex. Gen. Laws 2778, 2784; Tex. Penal Code Ann. § 35A.02(b)(4)(A), amended by Act of May 31, 2015, 84th Leg., R.S., ch. 1251 § 27 sec. 35A.02(b), 2015 Tex. Gen. Laws 4209, 4219.

On appeal, Appellant claims the evidence was legally insufficient to support a conviction on Count II because the State presented no evidence that Appellant knowingly made or caused to be made a false statement or representation of material fact causing another person to benefit. Appellant also claims that he personally did not submit the requisite "claims," where the evidence demonstrated he only submitted EVVs upon which Outreach based their submission of claims to AmeriGroup. Finally, Appellant claims the evidence confirmed he ultimately netted only $1,962.21 from the allegedly improper claims; therefore, he could not be found guilty of procuring an amount equal to or greater than $2,500, as required by the offense charged.

In contesting the *mens rea*, Appellant argues the State presented no evidence Appellant "knowingly" made a false statement or representation of material fact. At trial, he argued Outreach lacked any policy or procedure specifically saying services could not be rendered after a patient's death. The jury, however, had before it ample evidence that Appellant: (1) was a college graduate who earned a degree in Economics and Business; (2) had verified his understanding he was to report all significant changes in Granados' health to his superiors; (3) knew to report to his supervisor immediately if his patient could not care for herself when left alone; and (4) knew he

20

was prohibited from performing services when his patient was not present. It was no great leap for a rational juror to conclude that Appellant could reasonably be expected to comprehend death represents a "significant change in health," that a dead person "is no longer present," and that a dead person cannot care for herself when left alone. From there, a rational juror could also conclude that Appellant knowingly concealed or failed to disclose Granados' death to continue to profit from Outreach paychecks compensating him for services allegedly rendered. Similarly, the rational juror could surmise that Appellant's continued access of the EVV system after his patient expired accrued to his financial benefit based on his misrepresentation of material fact.

Based on Appellant's electronic assertions, it was Outreach that actually submitted the claims for Medicaid reimbursement to AmeriGroup. Those claims, however, necessarily relied upon the truth of Appellant's EVV inputs, documenting the time spent for Medicaid-reimbursable services. Thus, Outreach was a conduit for Appellant's fraudulent behavior. During his training and follow-up reviews, Appellant verified his understanding of this procedure, and the importance of his veracity in documenting time and services rendered for Medicaid reimbursement. Appellant was aware that, without his EVVs, no claims could be submitted; and if no claims were submitted, Appellant would not be paid. The jury could rationally find it was Appellant, not Outreach, who committed the statutory offense by "submitting" the 52 fraudulent claims.

Appellant argues that the $1,962 netted by him was not sufficient to meet the statutory threshold of $2,500 required for the charged offense. Because Outreach was reimbursed by AmeriGroup in the amount of $3,463.27, Outreach represented the statutory "person," permitted (by Appellant's fraudulent behavior) "to receive a benefit or payment . . . under the Medicaid

21

program that [was] not authorized . . . and the benefit or payment received was $2,500 or more but less than $30,000."[15]

### (c) Count IV.

Pursuant to Count IV of the Indictment, and as charged by the court, under Texas Penal Code Ann. § 31.03(a)(e)(3), a person commits theft of property, more than $750 but less than $2,500, if that person (1) unlawfully appropriates property by acquiring and otherwise exercising control over property, other than real property, (2) of the value of $750 or more but less than $2,500 from the owner of said property, and (3) with intent to deprive the owner of the property. When calculating the grade of the theft, the statute allows amounts to be aggregated if the amounts were unlawfully obtained through a scheme or continuing course of conduct (here, the 52 claims made, based on Appellant's unauthorized EVV entries from October 12, 2017 to December 4, 2017). *See* Tex. Penal Code Ann. § 31.03(a)(e)(3).

Appellant contends he was not aware it was improper to continue billing for services rendered after Granados' death. For that reason, he argues the State did not prove beyond a reasonable doubt he had the requisite criminal "intent" to deprive the State (owner) of property to be convicted of theft.

---

[15] Several Outreach employees referred to Outreach as a "company." Former § 1.07(38) of the Penal Code (effective at the time Appellant was indicted), which included definitions applicable to the entirety of the Penal Code, defined "person" as "an individual, corporation, or *association.*" *See* Tex. Penal Code Ann. § 1.07(38), amended by Acts of May 4, 2017, 85th Leg., R.S., ch. 34 § 26, sec. 1.07, Tex. Gen. Laws 72, 81 (emphasis added). *See also Delay v. State*, 465 S.W.3d 232, 242 n.39 (Tex. Crim. App. 2014) (recognizing that, under § 1.07(38), a "person" includes a corporation).

According to the Penal Code, "a person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct to cause the result." *See* Tex. Penal Code Ann. § 6.03(a). The jury can infer intent from Appellant's actions before, during and after the subject events; intent can also be inferred from surrounding circumstances. *See Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998) (en banc) ; *cf.*, *Hooper*, 214 S.W.3d at 13 (citing *Cordova*, 698 S.W.2d at 111).

As addressed above, the jury was presented evidence from which a rational juror could conclude that Appellant intended to commit theft. In addition, when confronted by Lopez during the February 2018 phone call, Appellant did not deny he used the EVV system after Granados' death—instead, he stated there was more work to do. However, the work he was authorized to do could not be performed on a deceased individual. Any tasks he did in winding up Granados' affairs were not authorized for payment as confirmed during his training.

Appellant also asserts the State failed to prove Appellant's actions were committed without effective consent. There can be no consent when the transfer of property is induced by deception. *See* Tex. Penal Code Ann. § 31.03(b)(1). A rational juror could conclude, based on the evidence presented, that Appellant acted deceitfully: he knew Outreach depended on his truthful EVV billing, he knew he was required to report Granados' death, and he intentionally applied for compensation of Medicaid-reimbursable services—all unbeknownst to Outreach and the State. *See id*. § 31.01(1)(A) (among other meanings, deception includes "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true").

It is not the province of this Court to determine whether it is persuaded by the State's evidence; rather, the trier of fact is the sole judge of the credibility of the witnesses and the weight

23

of the evidence. *Rubio v. State*, No. 08-00-00341-CR, 2002 WL 125732, at \*3 (Tex. App.—El Paso January 31, 2002), no pet.) (citing *Bonham v. State*, 680 S.W.2d 815, 819 (Tex. Crim. App. 1984), *cert. denied*, 474 U.S. 865, (1985)). When viewed together and in the light most favorable to the verdict, we conclude the evidence was legally sufficient for a rational trier of fact to find beyond a reasonable doubt that the elements of Medicaid fraud and of theft, as charged, were met. Accordingly, Appellant's fourth point of error is overruled.

### III. CONCLUSION

Appellant's points of error are overruled. We affirm the trial court's judgment.

YVONNE RODRIGUEZ, Senior Justice

January 27, 2025.

Before Rodriguez, C. J.(Senior Judge), Palafox and Soto, JJ.
Rodriguez, C.J. (Ret.), sitting by assignment

(Do Not Publish)